UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JENNIFER CABARCAS,

            Plaintiffs,                                       **COMPLAINT**

vs.                                                    **JURY TRIAL DEMANDED**

IKAN, INC.,

            Defendant.
-----------------------------------------------------------------X

## I.    INTRODUCTION

1. Plaintiff is a dark-skinned Hispanic woman, whose national origin is Colombian. She was terminated by her former employer, defendant IKan, Inc., because of race and national origin discrimination and in retaliation for having complained of unlawful discrimination. She brings this action pursuant to Title VII of the Civil Rights act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); 42 U.S.C. § 1981, and the New York State Human Rights Law, N.Y. Executive Law § 296 ("NYSHRL"), and for violation of the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161, 1162 ("COBRA").

## II.    PARTIES

2. Plaintiff, Jennifer Cabarcas, is a 39 year-old dark-skinned Hispanic woman who resides in Middletown, New York, in Orange County, within this judicial district.

3. Defendant, IKan, Inc., is a not-for-profit corporation which provides services to people with developmental disabilities. It is located in Florida, New York, in Orange County, within this judicial district. It may sue and be sued.

## III.    JURISDICTION AND VENUE

4. As plaintiff alleges that defendant has violated rights guaranteed to her by 42 U.S.C §§

2000e et seq. and 42 U.S.C. § 1981, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sec. 1331, 1343 (3) & (4) and 1367 and 42 U.S.C. §§ 1981, 1988.

5. As plaintiff's state-law claims under the NYSHRL arise from the same nucleus of operative facts as her federal claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Plaintiff timely filed a charge of race and national origin discrimination and retaliation with the EEOC, and she has received a right to sue notice from the EEOC within the past 90 days.

7. As the events giving rise to this action occurred in Orange County, New York, within this judicial district, this Court is the proper venue.

### IV.  FACTUAL AVERMENTS

8. In 2011, defendant IKan, Inc. recruited Ms. Cabarcas to work as a Medicaid Services Coordinator ("MSC").

9. At the time, Ms. Cabarcas was employed as an MSC at another social services agency.

10. Throughout her employment at IKan, Inc., until approximately the last two weeks of her tenure, Ms. Cabarcas was the only person of color employed by the agency.

11. Throughout her employment, Ms. Cabarcas well-performed the duties of her position and she was well-regarded within the developmental disabilities services community, including by the New York State regulatory agency, the Office for People With Developmental Disabilities ("OPWDD"), other service providers, consumers, and families of consumers.

12. In 2014, another IKan, Inc. employee, Caralyn Warran, a fellow MSC, made disparaging comments to Ms. Cabarcas about the fact that she is a single mother.

13. Ms. Cabarcas asked Ms. Warran not to make such comments and thereafter spoke with IKan's Executive Director, Laurie Keats, about Warran's hurtful comments.

14. Ms. Cabarcas' Lead Supervisor, Susan McCleery, who reported directly to Keats, was good friends with Warran.

15. After learning of Ms. Cabarcas' complaint about Ms. Warran, Ms. McCleery called Ms. Cabarcas a "hotheaded Latino" and a "bitch."

16. Rather than reprimanding Ms. McCleery, Ms. Keats echoed her biased remarks by telling Ms. Cabarcas that she was being overly emotional because she is "Spanish."

17. Ms. Cabarcas told Ms. Keats that she objected to these blatantly discriminatory comments.

18. In or about September 2014, Ms. McCleery and Ms. Keats conducted audits of certain MSC's client files, including those of Ms. Cabarcas.

19. They found certain minor deficiencies in Ms. Cabarcas' records.

20. In addition, they found deficiencies in the records of a Caucasian MSC, Judy Card.

21. In Ms. Cabarcas' case, Ms. Keats and Ms. McCleery disciplined her by issuing her a disciplinary write-up, requiring her to go into the IKan office three days a week – MSC's generally worked remotely from home – and placing her on probation for six months.

22. By contrast, Ms. Card was not placed on probation, nor was she required to work from the IKan office.

23. Instead, within six months of the audit, IKan promoted Ms. Card to a supervisory position.

24. Ms. Cabarcas complained to Ms. Keats about this differential treatment and told her that she felt that she was being singled out and targeted.

25. In response, Ms. Keats again suggested that Ms. Cabaracas was being overly emotional because she was "Spanish."

26. In or about November 2015, Ms. Keats told Ms. Cabarcas, who was about to receive her Master's Degree in December 2015, that she would likely promote her to a position in "Community Habilitation" effective January 2016.

27. However, in December 2015, Ms. Keats and Ms. McCleery assigned Caralyn Warran, who had been promoted to the position of Quality Assurance ("QA") Coordinator, to audit Ms. Cabarcas' client files.

28. Warran had previously had deficiencies with her own records, including some that had been identified by OPWDD during that agency's annual regulatory audits.

29. Yet, IKan treated Ms. Warran, who is Caucasian, far more favorably than Ms. Cabaracas, and indeed had promoted her to QA Coordinator.

30. Ms. Cabarcas voiced concerns to Ms. Keats about Ms. Warran auditing her records given the rift between them which had developed because Ms. Warran had made disparaging remarks about Ms. Cabarcas being a single mother.

31. However, Ms. Keats brushed aside Ms. Cabarcas' concerns and authorized Ms. Warran to audit Ms. Cabaracas' records.

32. Ms. Warran found minor deficiencies in Ms. Cabarcas' records.

33. Ms. Cabarcas had observed Ms. McCleery and Ms. Warran auditing each other's records and each pointing out any problems to the other at the time and allowing the other to correct any errors, so that they would not be counted as deficiencies.

34. Ms. Cabarcas was afforded no such benefit, despite having only minor deficiencies, none of which remotely compromised client health or safety.

35. To Ms. Cabarcas' knowledge, Ms. Warran did not audit any other MSC's records at or about the same time that she audited Ms. Cabarcas' records.

4

36. Despite the fact that Ms. Cabarcas promptly fixed the identified minor deficiencies, Ms. Keats and Ms. McLeery harshly punished her.

37. Ms. Cabarcas was placed on probation again, denied promotion to the Community Habilitation program, which was instead given to a Caucasian friend of Ms. Keats who lacked the educational requirements for the position, and again required to work out of the IKan office for three days per week.

38. The IKan office is one large open space with no private space, which is not conducive to speaking confidentially with clients and about clients with family members and other service professionals. The open, loud office space was vastly inferior to being able to work out of a home office.

39. Over the next few months, Ms. Cabarcas was treated with disdain and hostility by Ms. Keats and Ms. McCleery.

40. In January 2016, Ms. McLeery wrote Ms. Cabaracas up for using profanity in the office.

41. Employees in the office, including Ms. McCleery, regularly used profanity without any negative repercussions.

42. When Ms. Cabarcas responded to the write-up by noting that she was being treated unfairly and had been "singled out," Ms. McLeery responded, "Are you done with your emotional Latin rant yet?"

43. On April 1, 2016, Ms. Keats terminated Ms. Cabarcas' employment.

44. In doing so, Ms. Keats lied about the alleged reasons for Ms. Cabarcas' termination, ironically claiming that she, Ms. Cabarcas, had created a "hostile work environment" for other employees and had not fixed deficiencies in her records, which was untrue.

45. Ms. Keats ordered Ms. Cabarcas to have no contact with her clients or their families.

Ms. Cabarcas had been the MSC for many of her clients and their families for ten years, having been their MSC at the agency prior to IKan. It was extremely upsetting to her that her clients and their families would believe that she had simply abandoned them without any notice. However, to the detriment of the clients she claimed to care about, Ms. Keats refused to allow any transitional period for Ms. Cabarcas to leave her clients in a less damaging manner.

46. In addition, Ms. Keats spitefully sent an email to other agencies that Ms. Cabarcas was no longer employed by IKan. She had not done so when other employees had stopped working for IKan.

47. In addition, in an attempt to prevent Ms. Cabarcas from receiving unemployment insurance, Keats lied to the NYS Department of Labor about the circumstances under which Ms. Cabarcas was terminated, falsely claiming that it was for record-keeping deficiencies.

48. IKan, Inc. terminated Ms. Cabarcas and otherwise treated her less favorably than similarly situated Caucasian employees in the terms and conditions of her employment, including by requiring her to work out of IKan's office, placing her on probation, denying her a promotion and otherwise creating a hostile work environment, in substantial part, because of her race (Hispanic) and national origin (Colombian).

49. In addition, in taking the aforementioned adverse actions, including Ms. Cabarcas' termination, IKan retaliated against her because of her complaints that were protected under Title VII's opposition clause, 42 U.S.C. § 1981, and the NYSHRL. including her complaints regarding Ms. Keats and Ms. McCleery's discriminatory remarks about her ethnic and racial background.

50. After terminating Ms. Cabarcas, IKan failed to properly give her notice of her right to elect to continue benefits, as required by COBRA.

51. Instead, Ms. Keats sent Ms. Cabarcas a letter directing that she had only five days within

which to decide whether to continue benefits and to pay for such benefits, rather than the statutorily required 60 days.

52. The notice from Ms. Keats was also deficient because it failed to include information required by COBRA, including: (i) A written explanation of the procedures for electing COBRA; (ii) How to notify the plan administrator of the election; (iii) The date COBRA coverage will begin (*i.e.*, the day after the date upon which the benefits otherwise would end); (iv) The maximum period of continuation coverage, which must be at least 18 months from the date of the qualifying event; (v) The monthly premium amount; (vi) The due date for the monthly payments; (vii) Any applicable premium amount due for a retroactive period of coverage; (viii) The address to which to send premium payments; (ix) A qualified beneficiary's rights and obligations with respect to extensions of COBRA coverage; and (x) The bases for early termination of the period of COBRA coverage.

53. After sending this notice, Ms. Keats was advised that it failed to comply with COBRA and she was requested to send a COBRA-compliant notice to Ms. Cabarcas.

54. To this day, Ms. Keats has willfully refused to send Ms. Cabarcas a COBRA-compliant election notice.

55. As a result of IKan's discriminatory and retaliatory actions, Ms. Cabarcas has suffered lost pay, lost benefits, damage to her professional and personal reputation, physical sickness, and emotional distress.

56. IKan's acts and omissions, set forth herein, were malicious and taken in reckless disregard of Ms. Cabarcas' federally protected civil rights.

### IV.  CAUSES OF ACTION

57. Plaintiff incorporates paras. 1-56 as if fully restated herein.

58. By dint of the foregoing, defendant subjected plaintiff to unlawful race and national

origin discrimination in violation of Title VII, 42 U.S.C. § 1981 and the NYSHRL.

59. By dint of the foregoing, defendant subjected plaintiff to unlawful retaliation in violation of Title VII, 42 U.S.C. § 1981 and the NYSHRL.

60. By dint of the foregoing, defendant violated plaintiff's rights under COBRA.

## V. **PRAYER FOR RELIEF**

61. WHEREFORE, plaintiff prays that this Honorable Court:

(a) empanel a jury to hear and decide this matter;

(b) award to plaintiff compensatory damages, including damages for lost pay and benefits, emotional distress, loss of enjoyment of life, and physical sickness;

(c) award to plaintiff punitive damages;

(d) award to plaintiff statutory penalties for defendant's COBRA violation;

(e) order plaintiff to be reinstated to her former position, or award her front pay;

(f) award to plaintiff her reasonable attorneys' fees and costs pursuant to 42 U.S.C. section 1988, and

(g) enter any other relief justified by the law and facts.

Dated: October 28, 2016
      Goshen, New York

Respectfully submitted,

Christopher D. Watkins (CW 2240)
SUSSMAN & WATKINS
1 Railroad Ave. – PO Box 1005
Goshen, NY 10924
(845) 294-3991
chris_sussman1@frontiernet.net
*Attorneys for Plaintiff*